W. F. Bay Stewart *vs.* Michael Schall, James M. Danner, and Richard B. Sperry, trading as Schall, Danner & Sperry.

*Stock Gambling—Sales on Margins—Lex Loci Contractus— Evidence—Wagering contracts—Tender—Mala fides— Province of Court and Jury.*

The plaintiffs sued the defendant in assumpsit to recover an alleged balance due them for services, advances, and interest on purchases and sales of stocks, bonds, and grain, alleged to have been made by them for defendant at his request. Both plaintiffs and defendant resided in York, Pennsylvania, where the former conducted the business of bankers and brokers. The plaintiffs bought and sold on orders of the defendant, who deposited from time to time, a margin, or left certain profits as they accrued, with the plaintiffs to cover and protect them in the fluctuations of prices. The plaintiffs made their negotiations in the markets of New York, Baltimore, Chicago, and Philadelphia. The defendant failing to keep

Stewart *vs.* Schall, *et al.*

up his margins, the plaintiffs sold some stocks credited to him, and sued for the balance still required for their reimbursement. The defendant pleaded specially that by the law of Pennsylvania, where the contracts were made and to be performed, they were all gambling transactions and void, as the real intent of the parties was to wager on, and speculate in the rise or fall of the prices of the articles dealt in, which were not to be actually delivered, but the one party was to pay and the other party to accept the differences between the contract prices and the market prices of the same at the dates fixed for executing said contracts, or when said contracts should be closed. HELD:

1st. That it was competent for the defendant to show, that although in form the transaction was perfectly legal, it was in fact a mere guise under which a gambling transaction might be conducted.

2nd. That although the plaintiffs may have acted merely as defendant's broker in negotiating the contracts, and were suing not on the contracts, themselves, but for services performed and money advanced for the defendant, they stood in the same position as if seeking to enforce the original agreement, and could not recover for services rendered or losses incurred by themselves in forwarding the transaction.

3rd. That as to the *locus* of the transaction, the jury should have been given the law of Pennsylvania, as comprised in the decisions of that State, bearing on wagering contracts within its limits.

4th. That the action being for services rendered by the plaintiffs to the defendant, it was their relations with him on which the suit was based; and the parties with whom they dealt in making the purchases and sales were in nowise connected with the suit.

5th. That the validity of the transaction was to be tested by the Pennsylvania cases, according to which, if there was such an understanding between the plaintiffs and the defendant, as the latter claimed there was, the transactions were merely wagers, and no recovery could be had by the plaintiffs.

6th. That no tender to the defendant of the stocks sold was required before sale, because of the authority given the plaintiffs to sell, when, from exhaustion of margins, it was necessary for their indemnification.

7th. That the re-purchase of said stocks by the plaintiffs at the time of their sale, and as part of the same transaction, and at the same

price, was evidence of bad faith on the part of the plaintiffs, and was incompatible with their relations to the defendant.

It would be invading the province of the jury for the Court to characterize any piece of evidence as entitled to special and controlling weight with them.

APPEAL from the Baltimore City Court.

The case is stated in the opinion of the Court.

*Exception.*—At the trial the plaintiffs offered the six following prayers:

1. That there is no evidence in this cause from which the jury can find that the contracts for the purchase and sale of wheat made in Chicago, testified to by the witnesses Walter F. Cobb and Henry P. Darlington, were not *bona fide* and lawful contracts.

2. That there is no evidence in this case from which the jury can find that the purchases and sales of stocks and bonds, testified to by the witnesses examined on the part of the plaintiffs under the commission issued to take testimony in New York, and by the witnesses Hambleton and Nelson, were not lawful and *bona fide* contracts.

3. That if the jury find from the evidence that the defendant ordered the plaintiffs, as brokers, to buy and sell stocks and other securities for him in the New York and Baltimore markets, on commission, subject to the usages and rules of said markets; and if they find that in pursuance of said order the plaintiffs, by their agents, did buy and sell stocks and other securities in said markets, in accordance with the rules and usages thereof, and made reports of such purchases and sales to the defendant, and that plaintiffs, by their agents, actually received and paid for the stocks and securities so purchased and actually delivered, and were paid for those so sold, then such purchases and sales were binding upon the defendant, and

Stewart *vs.* Schall, *et al.*

he became liable to account to the plaintiffs for the excess that the jury may find they paid for stocks and securities so purchased by them, over and above the amount received by them for sales so made by them, and for such commissions of plaintiffs for making said purchases and sales as the jury may find the defendant and plaintiffs agreed upon.

4. That if the jury find that the defendant ordered the plaintiffs, as brokers, to buy and sell wheat for him on commission, according to the rules and custom of the market in which such orders might be executed; and if they find that in pursuance of such orders the plaintiffs, through their agents, made purchases and sales of wheat for defendant in Chicago, according to the rules and customs of that market; and if they find that the contracts of purchase so made, were settled in good faith, according to the terms thereof, and the usages and customs of said market, and that the plaintiffs paid the losses resulting from such contracts, and received the profits, and duly reported the same to the defendant, then the defendant became liable to account to the plaintiffs for the excess, if any, of the losses so paid by them on said transactions, over and above the profits received by them on the same, and for such commissions of the plaintiffs for making said purchases and sales as the jury may find was agreed upon between the parties.

5. That if the jury find that the defendant employed the plaintiffs as his brokers, to buy and sell on commission, stocks, bonds and grain for him in the markets of New York, Baltimore and Chicago, under an agreement that the defendant should secure the plaintiffs by depositing with them a margin, as testified to by defendant; and if they find that the plaintiffs, through their agents, executed said orders of the defendant in said markets, as required to be found in the plaintiffs' third and fourth prayers according to the custom and usages of said mar-

kets, and that plaintiffs paid all money necessary and required to be paid in the execution of such orders, and received all moneys that became receivable in the execution of said orders, and that they reported all said transactions to the defendant, and charged him with the money so paid for him, and credited him with the money so received by them for him; and if they find that the defendant failed to secure the plaintiffs by keeping up said margin when required, and that the plaintiffs thereupon sold such securities of the defendant as they had in hand, after notice to him in the manner shown in evidence, and reported said sales to defendant, then the plaintiffs are entitled to recover the loss sustained by them in the execution of the defendant's orders, as above set forth, and their commissions for executing the same.

6. That if the jury find the facts stated in the plaintiffs' third, fourth and fifth prayers, and further find that in the execution of the orders of the defendant therein referred to, the plaintiffs paid to the brokers employed by them, interest on the monthly balances due such brokers for the execution of said orders, and reported said payments, if entered to the defendant; and if they find that the custom and usage of the business in the markets where such orders were executed, was to charge interest on such monthly balances of accounts, then the plaintiffs are entitled to recover the interest so paid by them on account of the defendant.

The plaintiffs moved the Court to exclude from the consideration of the jury so much of the evidence of the defendant, Stewart, (taken subject to exception,) as to the alleged understanding of the defendant, that in ordering the purchases and sales of stocks, bonds and grain mentioned in the evidence, to be made by the plaintiffs, the defendant was only to pay or receive the difference between the purchases and sales of said stocks and securities, as irrelevant and inadmissible.

The plaintiffs moved to exclude the evidence, taken subject to exception, of the defendant, (including the Pennsylvania decisions offered in evidence under the agreement filed in this case,) as to the alleged law of Pennsylvania, with reference to the validity of the dealings between plaintiffs and defendant, offered in evidence, as irrelevant to the issues in this case.

And the defendant offered the eleven prayers, as follows:

1. That the plaintiffs have offered no evidence sufficient in law to prove that purchases and sales of grain were in fact made by them, or any agents of theirs, on behalf of the defendant, and that, therefore, they are not entitled to recover in this action on account of any of said alleged purchases and sales of grain.

2. That if the jury shall find from the evidence, that when the defendant gave to the plaintiffs the several orders offered in evidence for the purchase and sales of grain, it was mutually understood between them that the defendant was not to deliver any of the grain that he ordered to be sold, or to accept any of the grain that he ordered to be bought, but that all of said transactions were to be settled and adjusted by the payment or receipt as the case might be of differences between the prices at which said grain should be bought, and at which it should be sold; and if the jury shall find further, that in pursuance of said mutual understanding, the plaintiffs in their own names transmitted to their correspondents for execution, said orders of the defendant, and that said orders were executed by the said correspondents of the plaintiffs, upon the credit of the plaintiffs, and upon security advanced by them, then the plaintiffs are not entitled to recover in this action for any services rendered or advances made by them in furthering and conducting said transactions for the defendant.

3. That the plaintiffs cannot recover in this case upon the dealings in grain between them and the defendant,

unless the jury shall find from the evidence all the follow-ing facts:

1st. That the defendant authorized said dealings.

2nd. That the purchases and sales authorized by him were actually and *bona fide* made.

3rd. That the grain directed by him to be bought, was in fact bought by the authorized agent or agents of the plaintiffs in Chicago, and was in fact delivered by the seller or sellers to and accepted by said authorized agent or agents.

4th. That the grain directed by the defendant to be sold, was in fact sold by the authorized agent or agents of the plaintiffs in Chicago, and was in fact delivered by such authorized agent or agents to the purchasers thereof.

4. That if the jury shall find that the purchases of grain ordered by the defendant to be made on his account in Chicago, were in fact made, but that the grain so bought, instead of being delivered by the purchaser or purchasers thereof to the authorized agent or agents of the plaintiffs in Chicago, was settled for by the process of "ringing out" as described by the witnesses, Cobb and Darlington, then the defendant is not bound by such settlements, there being no evidence that he was aware of or assented to such mode of settlements, and the plaintiffs cannot recover upon any of the purchases which the jury shall find were settled by such process of ringing out.

5. That if the jury shall find that the sales of grain ordered by the defendant to be made on his account in Chicago, were in fact made, but that the grain so sold instead of being delivered by the authorized agent or agents of the plaintiffs in Chicago, to the purchasers, was settled for by the process of ringing out, as described by the witnesses, Cobb and Darlington, then the defendant is not bound by such settlements, there being no evidence that he was aware of or assented to such mode of settlements, and the plaintiffs cannot recover upon any of the

rules which the jury shall find were settled by such process of ringing out.

6. That if the jury shall find from the evidence, that some of said purchases and some of said sales of grain were settled for by the process of ringing out, as described by the witnesses, Cobb and Darlington, but upon the testimony are unable to determine which of said purchases and sales were so settled, and which were settled by the delivery and acceptance of the grain itself, then the plaintiffs have failed to make out their case as to any of said dealings in grain between them and the defendant, and are not entitled to recover for any losses claimed to have been sustained by them upon said dealings in grain, there being no evidence that the defendant was aware of or assented to said process of ringing out, as a method of settling purchases and sales of grain in Chicago.

7. That if the jury shall find from the evidence, that when the defendant gave to the plaintiffs the several orders offered in evidence for the purchase and sales of stocks, it was mutually understood between them that the defendant was not to deliver any of the stocks that he ordered to be sold, or to accept any of the stocks that he ordered to be bought, but that all of said transactions in stocks were to be settled and adjusted by the payment or receipt, as the case might be, of differences between the price at which said stocks should be bought and at which they should be sold; and if the jury shall further find, that in pursuance of said mutual understanding, the plaintiffs, in their own names, transmitted to their correspondents for execution, said orders of the defendant, and that said orders were executed by the said correspondents of the plaintiffs upon the credit of the plaintiffs, and upon security furnished by them, then the plaintiffs are not entitled to recover in this action for services rendered, or advances made by them in furthering and conducting said transactions for the defendant.

8. That if the jury shall find the facts stated in the defendant's second and seventh prayers, and shall further find, that the plaintiffs and defendant, at the time of the transactions in question, lived in the Borough of York, in the State of Pennsylvania, and that the orders for the purchase and sale of the grain mentioned in the second prayer, and of the stock mentioned in the seventh prayer, were given and received in said Borough of York, and that the understanding between the plaintiffs and defendant was, that the said transactions were to be settled there, then the said transactions are governed by the law of Pennsylvania, and the plaintiffs are not entitled to recover in this action for services rendered, or advances made by them in furthering and conducting said transactions for the defendant.

9. That if the jury find from the evidence, that on the 30th of December, 1882, the plaintiffs held one hundred and fifty shares of Consolidated Gas Company stock, which they had previously bought on account of the defendant and by his direction, and that on said 30th of December, 1882, they sold the said one hundred and fifty shares of said stock, without tendering the same to the defendant, and demanding payment therefor, then the said sale was not binding upon the defendant, and the plaintiffs are not entitled to recover for the difference between the prices at which the jury shall find the said shares were bought on the 23rd of April, 1881, the 10th of May, 1881, and the 25th of May, 1881, and that at which the same were sold on said 30th of December, 1882.

10. That if the jury find from the evidence, that on the 30th of December, 1882, the plaintiffs held one hundred and fifty shares of Consolidated Gas Company stock, which they had previously bought on account of the defendant, and by his direction, and that on said 30th of December, 1882, they sold the said one hundred and fifty shares of stock to J. H. Fisher, at the price of $42 per share, and at

the same time, and as a part of the same transaction, bought back from said J. H. Fisher, the same certificate, for one hundred and fifty shares of said stock, at the same price, of $42 per share, which they so sold to him, then the defendant is not bound by said transaction, and the plaintiffs cannot recover for the difference between the price of said stock as fixed by said transactions with said J. H. Fisher and the prices at which the plaintiffs bought said shares for the defendant in April and May, 1881.

11. That if the jury shall find from the evidence, that the defendant deposited with the plaintiffs, as margins for the stock and grain transactions mentioned in the plaintiffs' bill of particulars, the sum of about seventeen hundred and fifty dollars, and that the stock and grain transactions aggregated the sum of upwards of eight hundred thousand dollars, this fact of itself is strong evidence to show the nature and character of the dealings between the plaintiffs and defendant, and the intention of the parties; and if they further find the other testimony of the plaintiffs and defendant as to the question of intention to be in *equilibris*, then the large disproportion between the amount of money deposited as margins, and the aggregate amount of the transactions, is in itself sufficient to incline the scales in favor of the defendant as to the question of intention as to all the disputed transactions.

The Court ( STEWART, J.) granted the plaintiffs' prayers and motions, and rejected the prayers of the defendant.

The defendant excepted, and the verdict and judgment being against him, he appealed.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, RITCHIE, and BRYAN, J.

*Charles F. Haines*, and *John Prentiss Poe*, for the appellant.

The right to recover is not based on the contracts of sale and purchase, but on the implied assumpsits arising

from the doing of the work by the plaintiffs for the defendant at his request, and the expending of money by them for him, and at his special instance and request. But these implied contracts arose at York, the place where the orders were given, and hence recovery is sought to be had on Pennsylvania contracts. But "it is an universal principle, governing the tribunals of all civilized nations, that the *lex loci contractus* controls the nature, construction and validity of the contract." *Trasher vs. Everhart,* 3 *G. & J.,* 234.

If valid by the law of the place where made, the contract is valid everywhere ; if void or illegal by the law of the place of contract, it is held void and illegal everywhere. *Story on the Conflict of Laws, secs.* 242, 243 ; *DeSobry vs. DeLaistre,* 2 *H. & J.,* 193, 221, 228 ; *B. & O. R. R. Co. vs. Glenn,* 28 *Md.,* 321 ; *Eastwood vs. Kennedy,* 44 *Md.,* 563, 571 ; *Scudder vs. The Union National Bank,* 91 *U. S.,* 411 ; *Andrews vs. Pond,* 13 *Peters,* 78 ; *Stevenson vs. Payne,* 109 *Mass.,* 378 ; *Kennedy vs. Cochrane,* 65 *Maine,* 594.

The motion to exclude the evidence of the defendant as to the law of Pennsylvania, including the decisions mentioned in the agreement, with reference to the validity of the dealings between plaintiffs and defendant, should, therefore, have been denied. For, "where the validity of a contract, made in one State, and in violation of the law of that State, is the subject of inquiry in the Courts of another State, the decisions of the Courts of such first State ought to be respected and followed." *Moore vs. Clopton,* 22 *Ark.,* 125.

It was not for the Court below to determine whether the law announced in the cases mentioned is *bad law,* but whether it is Pennsylvania law.

The transactions were governed by the law of Pennsylvania, and by the law of that State the plaintiffs could not recover. The fact that suit was brought in Maryland and

process served on the defendant while he chanced to be in Baltimore, is the best proof of what the plaintiffs themselves thought of their rights to recover in the Courts of Pennsylvania. See *Brua's Appeal,* 55 *Pa. St.,* 294; *Smith vs. Bouvier,* 70 *Pa. St.,* 325; *Kirkpatrick vs. Bonsall,* 72 *Pa. St.,* 155; *Maxton vs. Gheen,* 75 *Pa. St.,* 166; *Fareira vs. Gabell,* 89 *Pa. St.,* 89; *North vs. Phillips,* 89 *Pa. St.,* 250.

The last case on the subject is *Patterson's Appeal,* decided in 1883, and reported in 13 *Weekly Notes of Cases,* page 154, in which *Fareira vs. Gabell,* is followed.

The view taken by the Pennsylvania Courts has been denominated unique, but until reversed, it is the law of Pennsylvania nevertheless. It is admitted by Biddle, in his very able treatise on *Stockbrokers, page* 308, that these cases are sufficient to settle a question of law; and while expressing a doubt as to whether they will be recognized as authority outside of Pennsylvania, admits that they declare the law of the State at present. Contrary, however, to the view taken by Biddle, the principle announced in *Ruchizky vs. DeHaven,* 97 *Pa. St.,* 202, has since been followed in *Flagg vs. Baldwin,* 38 *N. J. Eq.,* 219, and *Cobb vs. Prell,* 22 *Amer. Law Reg.,* 609. See also, dissenting opinion of Justice WOODRUFF, in *Markham vs. Jaudon,* 41 *N. Y.,* 256; and the rule established in *Fareira vs. Gabell,* which has been followed by the Supreme Court of the United States, and by many of the ablest Courts of this country.

It is conceded that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them but to go into the market to buy them. *Benjamin on Sales, sec.* 82. A short sale may, therefore, be valid. *Appleman vs. Fisher,* 34 *Md.,* 540; *Maxton vs. Gheen,* 75 *Pa. St.,* 166.

But such a contract is only valid where the parties really intend and agree that the goods are to be delivered

by the seller, and the price to be paid by the buyer. If, under guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is illegal and void. All the cases concede, and many expressly decide this point. *Benjamin on Sales, sec.* 542; *Grizewood vs. Blane,* 11 *C. B.,* 536; *Irwin vs. Williar,* 110 *U. S.,* 499; *Dickson's Executor vs. Thomas,* 97 *Pa. St.,* 278: *Kirkpatrick vs. Bonsall,* 72 *Pa. St.,* 155; *Gregory vs. Wendell,* 39 *Mich.,* 337; *Gregory vs. Wendell,* 40 *Mich.,* 432; *Rumsey vs. Berry,* 65 *Me.,* 574; *Pickering vs. Cease,* 79 *Ill.,* 328; *Lyon vs. Culbertson,* 83 *Ill.,* 33; *Tenney vs. Foote,* 4 *Ill. App.,* 594, *approved in Tenney vs. Foote,* 95 *Ill.,* 99; *Beveridge vs. Hewitt,* 8 *Ill. App.,* 467; *Waterman vs. Buckland,* 1 *Mo. App.,* 45; *Williams vs. Tiedeman,* 6 *Mo. App.,* 269; *Barnard vs. Backhaus,* 52 *Wis.,* 593; *Everingham vs. Meighan,* 55 *Wis.,* 354; *Melchert vs. Amer. Union Tel. Company,* 3 *McCrary,* 521; 11 *Federal Reporter,* 193, *and note; Ex parte Young,* 6 *Bissell,* 53; *Rudolf vs. Winters,* 7 *Neb.,* 126; *Cobb vs. Prell,* 22 *Amer. Law Reg.,* 609, *and note; Flagg vs. Baldwin,* 38 *N. J. Eq.,* 219; *In re Green,* 7 *Bissell,* 338.

The criterion is the intention of the parties. Do they intend an actual *bona fide* sale, or a mere wager? If the former be intended, the contract is legal; if the latter, it is illegal and void. What was the intention of the parties in the inception of the contract, is a question of fact for the jury to determine from all the circumstances of the case. Hence, in *Grizewood vs. Blane,* 11 *C. B.,* 536, JERVIS, C. J., left it to the jury to say what was the plaintiff's intention and what was the defendant's intention at the time of making the contracts, whether either party

really meant to purchase or to sell the shares in question, telling them that if they did not, the contract was, in his opinion, a mere gambling transaction, and void. This ruling was held to be correct.

It has accordingly been decided:

*a.* That evidence of the defendant's inability to perform the contracts, known to the plaintiff, is admissible to show the real intention of the parties. *Kirkpatrick vs. Bonsall,* 72 *Pa. St.;* 155 ; *Ruchizky vs. DeHaven,* 97 *Pa. St.,* 202 ; *Gregory vs. Wendell,* 39 *Mich.,* 337.

*b.* That the intention of the parties may be inferred from the manner and method of carrying on the business, from the fact that the commodity in which the parties dealt was never tendered or demanded, from the large number of contracts which the party had on hand, and from the fact that the party dealing was not a regular dealer in the commodity bought and sold. *Rumsey vs. Berry,* 65 *Me.,* 570 ; *Gregory vs. Wendell,* 39 *Mich.,* 337.

*c.* That the plaintiff, when testifying, may be asked, whether or not he intended to deliver the commodity sold. *Gregory vs. Wendell,* 39 *Mich.,* 337 ; *Yerkes vs. Salomon,* 18 *N. Y. Sup. Ct.,* 471.

But it is claimed that the plaintiffs acted merely as the defendant's brokers in negotiating the contracts, and as they are suing, not on the contracts themselves, but for services performed and money advanced for the defendant. at his request, they do not stand in the same position as a party sued for the enforcement of the original agree-ment. It must be admitted that the English cases seem to hold to this doctrine in construing the Statute 8 and 9 *Vict., ch.* 109, *sec.* 18. *Thacker vs. Hardy,* 4 *Q. B. Div.,* 685 ; *Cooper vs. Meil,* 27 *W. R.,* 159 ; *Read vs. Anderson,* 48 *L. T. N. S.,* 74.

But these decisions proceed upon the principle that the statute renders the transactions simply void, not illegal. This appears from the language of Lindley, J., in *Thacker*

*vs. Hardy, supra.* He says: "if gaming and wagering were illegal, I should be of opinion that the illegality of the transactions in which the plaintiff and defendant were engaged, would have tainted, as between them, whatever the plaintiff had done in furtherance of their illegal designs, and would have precluded him from claiming in a Court of law any indemnity from the defendant in respect of liabilties incurred." In this country, wagering transactions are generally held to be illegal and void as against public policy. *Irwin vs. Williar,* 110 *U. S.,* 499, and cases there cited. But even here some of the cases, while conceding that the parties to the original contracts would fail on account of the illegality of the transactions, hold that the broker can recover his commissions and advances, on the ground that he can make out his case "without going into the illegal transactions." For this doctrine the leading cases of *Armstrong vs. Toler,* 11 *Wheaton,* 258; *Brooks vs. Martin,* 2 *Wallace,* 70, and *McBlair vs. Gibbes,* 17 *Howard,* 232, are relied upon.

The principles enunciated in those cases do not apply to the case of the broker, for the following reasons:

1. There is a broad distinction between suits to enforce illegal contracts and those asserting title to money arising out of them. In all of the following cases, usually cited to sustain the broker's claim, the plaintiff was only asserting title to money which was the product of the illegal transaction: *State vs. B. & O. R. R.,* 34 *Md.,* 344; *Brooks vs. Martin,* 2 *Wallace,* 70; *McBlair vs. Gibbes,* 17 *Howard,* 232; *Thompson vs. Thompson,* 7 *Vesey,* 468; *Farmer vs. Russell,* 1 *Bos. & Pull.,* 296; *Tenant vs. Elliott,* 1 *Bos. & Pull.,* 3.

2. If money be loaned by the plaintiff to the defendant to pay losses incurred by the defendant in illegal transactions, it may be recovered back. It is simply a case of money loaned. *Armstrong vs. Toler,* 11 *Wheat.,* 278; *Petrie vs. Hanney,* 3 *Term,* 422; *Faikney vs. Reynous,* 4 *Burr.,* 2069.

Where, however, money is advanced in furtherance of an illegal transaction, the agent cannot recover from his principal the money advanced. *Brown vs. Turner,* 7 *Term Rep.,* 630; *Josephs vs. Pebrer,* 3 *B. & C.,* 639; *Buck vs. Buck,* 1 *Campbell,* 547; *Raymond vs. Leavitt,* 46 *Mich.,* 447; 1 *Parsons on Contracts, page* 111; *Brooks vs. Martin,* 2 *Wallace,* 79.

And this is the position of the plaintiffs in this case. They conducted the transactions for the defendant, they brought the parties together. It was their money, or their credit with their correspondents which enabled the defendant to speculate at all. As said in *Irwin vs. Williar,* 110 *U. S.,* 499, "where a broker is privy to a wagering contract, and brings the parties together for the very purpose of entering into the illegal agreement, he is *particeps criminis,* and cannot recover for services rendered or losses incurred by himself in forwarding the transaction."

Nearly all of the American authorities are to this effect, as a consideration of the following cases will disclose: *Irwin vs. Williar,* 110 *U. S.,* 499; *Beveridge vs. Hewitt,* 8 *Ill. App.,* 467; *Tenney vs. Foote,* 4 *Ill. App.,* 594, *approved in Tenney vs. Foote,* 95 *Ill.,* 99; *Barnard vs. Backhaus,* 52 *Wis.,* 593, 603; *In re Green,* 7 *Bis.,* 338, 341; *Melcher vs. Amer. Union. Tel. Co.,* 3 *McCrary,* 531; *Third Nat. Bank vs. Harrison,* 3 *McCrary,* 316; *Cobb vs. Prell,* 22 *Am. Law. Reg.,* 609; *Fareira vs. Gabell,* 89 *Pa. St.,* 89.

See also note to *Reed vs. Anderson,* reported in *Central Law Journal, Vol.* 21, *No.* 9, *page* 173, *August* 26, 1885. See also *Beard vs. Cunningham, Washington Co. Circuit Court,* before SYESTER, J.

*Charles Marshall,* for the appellees.

The following authorities were relied on: *Pixley vs. Boynton,* 79 *Ill.,* 351; *Logan vs. Musick & Brown,* 81 *Ill.,*

415; *Durant vs. Burt,* 98 *Mass.,* 161; *Sawyer, Wallace & Co. vs. Taggart,* 14 *W. P. D. Bush,* (*Ky.,*) 727; *Round- tree vs. Smith,* 108 *U. S.,* 274; *Brittain vs. Lloyd,* 14 *M. & W.,* 762; *Hill vs. Spear,* 50 *N. H.,* 253; *Santos vs. Ill- dige,* 29 *L. J. C. P.,* 348, 6 *C. B. N. S.,* 841; *Fustin vs. Appleman,* 34 *Md.,* 540; *B. & O. R. R. Co. vs. State,* 34 *Md.,* 364; *Brooks vs. Martin,* 2 *Wallace,* 70; *Irwin vs. Williar,* 110 *U. S.,* 509; *Dos Pasos on Stock Exchanges,* 436–443; *Armstrong vs. Toler,* 11 *Wheat.,* 258; *Petrie vs. Hanway,* 3 *Term,* 418; *Ex parte Pyke. In re Lister, L. R.,* 8 *Ch. Div.,* 756.

RITCHIE, J., delivered the opinion of the Court.

The plaintiffs sued defendant in assumpsit on the com- mon counts to recover an alleged balance due them for services, advances and interest on purchases and sales of stocks, bonds and grain, alleged to have been made by them for defendant at his request. Both plaintiffs and defendant resided in York, Pennsylvania, where the former conducted the business of bankers and brokers. The plaintiffs bought and sold, ostensibly at least, on orders of the defendant, who deposited from time to time or left certain profits, as they accrued, with the plaintiffs, as margins, to cover and protect them in the fluctuations of prices. These transactions extended over a period of from two to three years, and reached in the aggregate some eight hundred thousand dollars.

The plaintiffs made their negotiations in the markets of New York, Baltimore, Chicago and Philadelphia; the margin to be kept up by defendant, as to the transactions in the last named city being five per cent., and for the dealings in the other cities ten per cent.

In course of time, the defendant failing to keep up his margins, the plaintiffs sold some stocks credited to him, and sued for the alleged balance still required for their reimbursement.

Stewart *vs.* Schall, *et al.*

·In addition to the general issue, the defendant specially pleaded that by the law of Pennsylvania, where the contracts were made and to be performed, they were all gambling transactions and void, because both parties were and still are citizens and residents of Pennsylvania; that all of said alleged contracts were to be performed within said State, and were for the purchase or sale of the bonds or shares of stock of incorporated companies, or for the purchase or sale of wheat for future delivery; that neither party ever contemplated or intended to deliver or receive the said stocks or bonds or wheat, and they never were in fact delivered, nor had the plaintiffs or defendant ever the said stocks, bonds or wheat for delivery, nor did they ever intend that the other was bound to deliver the same, but that in all of said contracts, the real intent of the parties was to wager on and to speculate in the rise or fall of the price of said articles, and that the one party was to pay and the other to accept the differences between the contract prices and the market prices of the same, at the dates fixed for executing said contracts, or when said contracts should be closed. The plaintiffs replied, traversing these averments. An agreement was made by the parties that the following decisions, viz., *Ruchizky vs. De Haven*, 97 *Penn. St.*, 202; *Dickson's Ex'r vs. Thomas*, 97 *Penn. St.*, 278; *Fareira vs. Gabell*, 89 *Penn. St.*, 89; *North vs. Phillips*, 89 *Penn. St.*, 250; *Brua's Appeal*, 55 *Penn. St.*, 294, should be read at the trial of the case as evidence of the law of Pennsylvania, and have the same effect as if proved under a commission or by the testimony of members of the bar of that State.

There was judgment for the plaintiffs and the defendant appealed.

The testimony of the defendant, taken subject to exception, including the Pennsylvania decisions offered under the agreement as to the alleged law of Pennsylvania, with reference to the validity of the dealings between plaintiffs

and defendant, was on motion of plaintiffs improperly ruled out as irrelevant to the issues. The six prayers of the plaintiffs were granted. All the defendant's eleven prayers were rejected.

While the testimony of the plaintiffs tends to show that the dealings between them and defendant were *bona fide,* and that an actual delivery of the articles bought and sold by them for defendant, was intended, and there were actual purchases and sales made, and actual delivery to the defendant was not made because waived by him, or an equivalent under the rules of exchange was accepted by him ; the proof also shows that in the numerous trans-actions, there was no actual delivery but in a single in-stance, and the defendant testifies explicitly that it was the express understanding between him and plaintiffs that the stocks and grain were not to be bought outright, and no delivery was to be made, but that he was simply to deal with them on margins ; if the market was in his favor he would gain, if it went against him he would lose ; that the total amount of margins put up by him, outside of mere profits from the fluctuations of the market, was $1700. He further testified, that while the transactions carried on within his margins of five and ten per cent., aggregated $800,000, some of the items of purchase and sale amounting to over $17,000, he was worth only $3500 ; that he was a lawyer by occupation, and resided next door to plaintiffs who knew him well. This and similar testi-mony from him, was competent to go to the jury. In cases like this, it is competent to show that although in form the contract is perfectly legal, it is in fact a mere guise under which a gambling transaction may be conducted. The true nature of a fraud upon the law and public morals could not otherwise be exposed, and the evil of wagers under the guise of a legitimate enterprise be prevented.

This principle is well settled apart from what the law in Pennsylvania may be. *Grizewood vs. Blane,* 11 *C. B.,*

536; *Benjamin on Sales, sec.* 542; *Irwin vs. Williar,* 110 *U. S.,* 499. The plaintiffs seem to assume that if they acted merely as defendant's broker in negotiating the contracts, and as they are suing not on the contracts themselves, but for services performed and money advanced for the defendant, they do not stand in the same position as if seeking to enforce the original agreement. But as laid down in *Irwin vs. Williar,* 110 *U. S.,* 499, "where a broker is privy to a wagering contract, and brings the parties together for the very purpose of entering into an illegal agreement he is *particeps criminis,* and cannot recover for services rendered or losses incurred by himself in forwarding the transaction."

As to the *locus* of the contract between the parties, the jury should have been given the law of Pennsylvania, as comprised in the decisions of that State bearing on wagering contracts within its limits. The defendant employed plaintiffs to make purchases and sales, but the settlement was to be with them in York. His name was not disclosed in any of the transactions, and the plaintiffs conducted the negotiations in their own name and upon their own credit. And the plaintiffs have declared in assumpsit on the common counts for services rendered by them. It is their relations with defendant on which the suit is based. The parties with whom they dealt are in no wise connected with the suit. According to these Pennsylvania cases, if there was such an understanding between plaintiffs and defendant, as the latter testifies to, the transactions were mere wagers, and no recovery can be had by plaintiffs.

It follows, that, defendant's second, third and seventh prayers, going to the *bona fides* of the transactions, should have been granted instead of refused. The defendant's eighth prayer should also have been granted. This relates to the *lex loci contractus.* The law of the place where a contract is made is to be looked to in determining its

Stewart *vs.* Schall, *et al.*

validity and construction. *Trasher vs. Everhart,* 3 *G. & J.*, 234. As to his ninth prayer, relating to the Consolidated Gas Company stock, we think it was properly refused, no tender to the defendant being required before sale, because of the authority given plaintiffs to sell when from exhaustion of margins it was necessary for their indemnification. His tenth prayer, however, relating to the sale and re-purchase of the said stock as one and the same transaction, by plaintiffs, should have been granted, as importing bad faith, and not compatible with their relations to the defendant. Defendant's first prayer, instructing the jury there was no evidence of any purchases or sales of grain by plaintiffs or their agents, on behalf of defendant, was properly rejected. His fourth and fifth prayers, referring to the "ringing out" process, and asking an instruction that there was no evidence that defendant knew anything of such a mode of settlement, were likewise properly refused. His eleventh prayer w also correctly refused. It would be invading the province of the jury for the Court to characterize any piece of evidence as entitled to special and controlling weight with them.

In regard to plaintiffs' prayers, with the exceptio of the first two, which, in our opinion, were improperly granted, we think, based as they are upon the assumption of *bona fides* in the transactions, they might be allowed to stand with the granting of the instructions we have indicated as due to the defendant.

> *Judgment reversed, and*
> *new trial awarded.*

(Decided 14th May, 1886.)