James Converse v. M. J. Miller, Administratrix, etc.

1. In 1864 an agent, acting with the advice and assistance of his principal, surrendered to the Cotton Bureau of the Confederate States, then dominant in Texas, one-half of the principal's cotton, to obtain a permit to export the other half to Mexico and thence to Liverpool. *Held,* that the transaction was in direct aid of the rebellion, and in violation of the blockade and of the laws of the United States then in force; that the principal and agent were *in pari de'icto,* and neither of them could maintain a suit against the other for proceeds or other liabilities arising out of the transaction.

Appeal from Harris.    Tried below before the Hon. C. B. Sabin.

In April, 1864, Converse, plaintiff below, held a note against one Lewis, which was payable in cotton.    Muter Miller, the intestate of the appellee, was then a clerk in the office of W. J. Hutchins, Chief of the Cotton Bureau of the Confederate States. Converse arranged with Miller to collect the cotton from Lewis, and to convert it into money for him, and empowered Miller to "exercise his own judgment about the matter."    Miller collected thirty-five bales of cotton on the note and sold eighteen of them to the Cotton Bureau, receiving in consideration thereof a permit to export the other seventeen, and also certificates of the Cotton Bureau for Confederate bonds, to be paid to Converse for the eighteen bales turned over to the bureau.    Before this was done, and in contemplation of shipment, Converse wrote to Miller from San Antonio, discussing the expediency of shipping the cotton through that point, and there turning over to the bureau its half of it, and also speaking of the Confederate bonds which were to be received for the cotton to be delivered to the bureau.    This letter was dated April 15, 1864, and showed that Converse was entirely familiar with the transactions of the Cotton Bureau, and knew and consented to the transfer to it of one-half of the cotton.

Converse's seventeen bales were shipped along with some five hundred bales belonging to Hutchins, the Chief of the Cotton Bureau, and in the consignment and returns got confused with Hutchins' cotton. The returns of some 283 bales were made to Hutchins, but he could not tell whether Converse's seventeen bales were part of them or not. Several letters from Miller to Converse appear in the record, fully posting the latter as to the disposition made of the cotton, and the condition of the whole matter so far, apparently, as it was known to Miller himself. Converse admitted in his petition a payment of a draft of his for $363, by Miller, and allowed credit therefor. It is not shown that Miller ever received any proceeds from the cotton, but he represented the money as " perfectly safe." He died in the spring of 1866, and Converse brought this suit against his widow and administratrix, who is the appellee.

The opinion of the court discloses all other facts of any relevancy to the rulings here made. In the court below, and in the briefs in this court, the case was contested on the ordinary principles of law relating to principal and agent, and the liabilities of the latter to the former. These were expounded in the instructions given to the jury, which are not pertinent to the opinion of this court.

The jury appear to have charged the defendant for eight and a half bales of the cotton, and allowed her credit for the money paid by her intestate on Converse's drafts, and finding a balance in her favor of some $40, for which she had judgment.

A new trial being refused, Converse appealed.

*A. H. Willie*, for the appellant.

*Hill & Hill*, for the appellee.

Lindsay, J.—As the agent of the appellant, the intestate of the appellee received for his principal, in the year 1864, thirty-

five bales of cotton, to be sold by him in the " exercise of his own judgment about the matter," and to account for the proceeds. For the purpose of effecting a sale he deemed it necessary to surrender one-half of the cotton to the public authority, which had temporary control in the State, to obtain a permit to get the remainder into Mexico, from whence it might be shipped, under contract with a mercantile house in Matamoros, to the Liverpool market, for sale. To get the cotton shipped to Liverpool, the agent contracted with the house in Matamoros to give one-half of the cotton to defray the expense of the shipment.

All this arrangement was made in contravention of the laws of the United States, establishing a blockade of all ports of entry in the insurgent States. In this suit, by the principal against his agent, for the value of the cotton, the proof upon the trial showed very satisfactorily that the principal was aiding and assisting his agent, by his counsel and advice, to consummate all this negotiation and arrangement; and the parties, both principal and agent, being *in pari delicto,* this court will not lend its aid to either party in the application of the principles of commercial law to the solution of the relative duties and obligations of principal and agent in this transaction. If the parties were faithless to each other in the conduct and management of this contraband business, they must abide its results without seeking the aid of a court of justice to enforce any stipulation, agreement or contract, express or implied, in relation to it. It was an adventure in defiance of law, in which both parties participated; and the law will not interpose, at the instance of either party, to adjust and enforce any supposed rights arising out of such illegal relations of principal and agent in regard to it. The whole transaction was illegal and against public policy, and the transgression of a positive law. There can be no binding contract, express or implied—no obligation, stipulating for iniquity, as all contracts are regarded, which are in violation of positive law, however dim and shadowy may be the moral turpitude in-

volved in them. The courts will not lend their aid to any party who bases his cause of action upon any illegal act. The moral maxim of the law is, "no polluted hand shall touch the pure fountain of justice." The sale of one moiety of the cotton to the Chief of the Cotton Bureau of the Confederate States, was an act done, not incidentally, but directly, in aid of the rebellion, against the public policy of the nation, in violation of the statutes of the government, and its recognition would be utterly repugnant to all the principles of administrative justice. Each of the parties in this litigation was planning, contriving and negotiating this traffic and sale, and neither has a right to make the courts of the country the medium of enforcing good faith between them, in the adjustment and settlement of their supposed relative rights in the subject matter of that illegal traffic. As they placed themselves, so must they stand, unaided and unassisted by the courts of the country in the extrication of either from whatever of misfortune or of evil consequences may have resulted from these acts. The judgment is therefore reversed; and this court proceeding to render here the judgment, which should have been entered there, the cause is dismissed from the docket of the district court.

Reversed and dismissed.